# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE UNITED STATES OF AMERICA
*ex rel.* MICHAEL L. DAVIS,

      **Plaintiffs,**

      **v.**

THE DISTRICT OF COLUMBIA,

      **Defendant.**

**Civil Action No. 06-629 (JDB)**

## MEMORANDUM OPINION

Relator Michael L. Davis ("Davis"), brings this <u>qui tam</u> action on behalf of the United States against defendant the District of Columbia ("the District"), under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 <u>et seq.</u> Davis alleges that the District knowingly submitted false claims to the federal government for reimbursement of special education costs incurred by the District of Columbia Public Schools ("DCPS"), because the District did not maintain legally required documentation to support its reimbursement requests. The parties have filed [101] [102] cross-motions for summary judgment, and Davis has filed [108] a motion seeking leave to file a (lodged) sur-reply. For the reasons set forth below, the Court will grant in part and deny in part the parties' cross-motions for summary judgment, and grant Davis leave to file his sur-reply.

## BACKGROUND

"It is common knowledge that Medicaid is a joint federal and state program that funds health care services for certain groups." <u>United States ex rel. Davis v. District of Columbia</u>, 679 F.3d 832, 834 (D.C. Cir. 2012). "Less well known is the process by which Medicaid funds are disbursed through local government to agencies to care for those in need and the safeguards in

place to make sure that the proper amounts of funds are provided for services properly rendered." Id. This case raises concerns about the cavalier process by which the District sought reimbursement for tens of millions of dollars in special education costs incurred by DCPS in the late 1990s.

### A. Regulatory Background

Medicaid funds medical services for low-income and disabled individuals, and is jointly administered and funded by federal and state government agencies. See 42 U.S.C. §§ 1396a(30)(A) & 1396d(b). The federal government generally bears a larger burden of the cost; its share is known as the "Federal Financial Participation" or "FFP" amount. 42 C.F.R. § 400.203. In the District, the federal share of Medicaid costs is approximately 70%, with the District picking up the remainder. See Def.'s Stmt. of Undisputed Material Facts ("Def.'s Stmt.") [ECF No. 101-2] ¶ 2. At the federal level, the United States Department of Health and Human Services ("HHS") administers Medicaid. Id. ¶ 4. Internally, HHS has delegated its Medicaid administration responsibilities to another federal agency, called the Centers for Medicare and Medicaid Services ("CMS"). Id.

Under federal Medicaid regulations, all states (and the District) must implement a "State Health Plan," specifying minimum criteria for coverage and payment of Medicaid claims. See 42 U.S.C. § 1396a(a)(30)(A). The District has implemented such a plan. See generally Ex. C to Def.'s Mot. for Summary J. ("Def.'s MSJ") [ECF No. 101]. CMS administers and supervises all state Medicaid programs, including the District's. Def.'s Stmt. ¶ 4. During the relevant time period, the District of Columbia agency responsible for administering the District's Medicaid program was called the Medical Assistance Administration ("MAA"), which was a component of

the District's Department of Health.[1]  See 42 C.F.R. § 431.10.

Pursuant to the Medicare Catastrophic Coverage Act of 1998 and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., health-related services provided to special-education children under the IDEA are generally reimbursable by Medicaid.  Def.'s Stmt. ¶ 3.  Every Medicaid-eligible child receiving services under this program must have an Individualized Education Plan ("IEP"), which documents the specific services that child requires and certifies that each service is medically necessary.  Id.

Under the District's Medicaid plan, DCPS is a certified clinical provider of IEP medical services for Medicaid-eligible special-education students.  Def.'s Stmt. ¶ 6.  DCPS provides both medical services (e.g., medication, counseling, speech therapy, etc.) and transportation services (e.g., busing students between school and a medical clinic).  DCPS is considered a "public provider" under the District's Medicaid plan, because it is a local government agency, rather than a private entity.  See 42 C.F.R. § 413.10.  And DCPS provides what are categorized as "clinic services" to special-education students.  See Ex. N to Pl.'s MSJ [ECF No. 99-17] ("District Medicaid Plan") § 9(b)(1).  Under the terms of the District's Medicaid Plan, "public providers" of "clinic services," like DCPS, are entitled to reimbursement "for 100 percent of their reasonable costs of providing services to Medicaid beneficiaries."  Def.'s Stmt. ¶ 8.

The process by which DCPS obtains reimbursement for providing special-education services to Medicaid-eligible children is also complicated.  During the fiscal year, MAA reimburses DCPS on an ongoing basis for the estimated costs of special education services.  Id. ¶ 9.  MAA reimburses for these costs using generic "interim rates" on DCPS's "interim claims."

---

[1] Currently, the District of Columbia Department of Health Care Finance ("DHCF") administers the District's Medicaid program.  Ex. I to Def.'s MSJ, Decl. of Adrienne Cooper ("Cooper Decl.") [ECF No. 101-12] ¶ 2.

Id. ¶¶ 9-10.  MAA, in turn, submits quarterly expense reports to CMS, for which it obtains federal reimbursement of the amount owed to the District.  Id. ¶ 11.

These "interim" Medicaid reimbursements are based on estimated, fixed payments for different categories of services (e.g., $40 for a doctor's visit, $10 for a bus ride), but they often do not reflect the actual cost of such services.  See id. ¶ 12.  Thus, at the end of each fiscal year, DCPS submits a reimbursement claim to MAA that includes the actual cost of all services provided.  Id.  "This annual filing of a reimbursement claim is similar to how a tax return reconciles an individual's withholdings throughout the year with proof of the actual tax owed at year end."  Davis, 679 F.3d at 834.  In other words, the interim payments DCPS has received throughout the year are subtracted from the year's actual costs, and the result is the amount of additional funds owed to—or owed by—DCPS.  See Def.'s Stmt. ¶ 12.

Under the District's Medicaid plan, MAA must review these annual filings at least once every two years and determine whether DCPS is owed additional funds or, alternatively, must return any overpayment.  See District Medicaid Plan § 9(b)(3).  A private, independent auditor generally performs this function, hired by MAA to review DCPS's year-end cost settlement claims.  Davis, 679 F.3d at 834.  For this reason, federal Medicaid regulations require DCPS to maintain financial data based on audit-quality documentation that allows "proper determination of costs payable."  42 C.F.R. § 413.20(a); see also id. § 413.24(a).  "To ensure that the claimed services were actually provided, auditors check for financial documentation and review student files for service-specific medical records or progress notes signed by the actual service provider."  Davis, 679 F.3d at 834.  Claims lacking the required service-specific documentation are not reimbursed.  See, e.g., 42 C.F.R. §§ 413.20, 413.24(a), 413.24(c).

**B. Factual Background**

Davis & Associates is an accounting firm in the business of assisting public entities in obtaining reimbursement for Medicaid-eligible medical services. The District hired Davis & Associates to prepare its year-end Medicaid reimbursement cost-settlement reports in fiscal years 1995, 1996, and 1997. Def.'s Stmt. ¶ 15. During those years, it apparently did so without incident. See id. During 1998, however, after Davis & Associates had begun work on the fiscal year 1998 claim, the District replaced it with another firm called Maximus (for reasons that the parties dispute, but are not relevant to resolving this case). Id. ¶ 17. Despite the District's hiring of Maximus, Davis & Associates completed the fiscal year 1998 work anyway (also for reasons that are not clear from the record). Id. ¶ 18. But DCPS never submitted the Davis & Associates claim to MAA. See id. ¶ 21. Instead, DCPS submitted the claim that had been prepared by Maximus. See id. ¶ 23. The 1998 Maximus claim was submitted in two parts, at two different times: first the medical services cost report (the "Maximus Cost Report"), and then the transportation cost report (the "Maximus Transportation Report" and, collectively, the "Maximus Reports"). Id. ¶ 24. The exact dates of submission are in dispute.

When Davis learned that DCPS was submitting the Maximus Reports to MAA, he contacted high-ranking District officials to notify them that only he had the required documentation to support DCPS's claims, meaning that the Maximus Reports could not possibly be documented adequately. See id. ¶¶ 27, 29. Davis also notified the District that he believed the Maximus Reports did not claim the full amount that was owed to DCPS. Id. ¶ 27. Despite these warnings, and despite the availability of several opportunities during the complicated reimbursement process in which such claims can be amended, DCPS made no adjustments to its

claims for fiscal year 1998. In May 2000, MAA paid DCPS $10.3 million as a tentative settlement for fiscal year 1998. <u>Id.</u> ¶ 28.

Pursuant to federal regulations and the District's Medicaid plan, MAA hired an independent auditor, Bert Smith & Company ("Bert Smith"), to review DCPS's claims for fiscal years 1996 through 1998. <u>See id.</u> ¶ 30. Among other problems, Bert Smith found—just as Davis had warned—that a large portion of DCPS's claims did not have adequate supporting documentation, and that DCPS should not have been reimbursed for at least $7.6 million of the $10.3 million it received as the settlement for fiscal year 1998. <u>Id.</u> ¶ 34. Indeed, the documentation was so sparse that Bert Smith could not even perform a traditional audit, and instead conducted what it described as an "agreed-upon procedures review." <u>See id.</u> ¶ 33. DCPS eventually returned that $7.6 million to the federal government. <u>Id.</u> ¶ 41.

### C. Procedural Background

Davis filed this action on April 4, 2006, alleging that the District and DCPS violated the False Claims Act by submitting the fiscal year 1998 reimbursement claims without maintaining adequate supporting documentation. <u>See</u> Compl. [ECF No. 1]. Davis eventually filed an amended complaint, which alleges that the submission of the 1998 reimbursement claims without supporting documentation violated the FCA's prohibitions on knowingly presenting a false claim, Am. Compl. [ECF No. 82] ¶ 30, using a false statement to get a false claim paid, <u>id.</u> ¶ 37, and conspiring to get a false claim paid, <u>id.</u> ¶ 41. "Davis asserts that submitting a claim for Medicaid reimbursement that lacks the supporting documentation called for by regulation defrauds the United States because the government would not knowingly have paid such a claim." <u>Davis</u>, 679 F.3d at 835. Regarding damages, "Davis does not allege, however, that any

claimed services were not provided or that any costs were exaggerated." Id. Davis also seeks

civil penalties. Am. Compl., Prayer ¶ 2.

On December 23, 2008, this Court granted in part and denied in part the District's motion

to dismiss. See United States ex rel. Davis v. District of Columbia, 591 F. Supp. 2d 30 (D.D.C.

2008). The Court dismissed DCPS as a defendant, holding that it was "not a suable entity under

the D.C. code." Id. at 40. The Court also dismissed Davis's treble damages and conspiracy

claims, finding that he had not alleged any actual damage to the federal government. See id. at

39-40. At the motion-to-dismiss stage, however, the Court rejected the District's argument that

the Court lacked subject-matter jurisdiction under the FCA, because Davis qualified as an

"original source" of the information leading to the alleged fraud. See id. at 36-37.

The parties proceeded with discovery, and Davis filed an amended complaint. The

parties ultimately filed cross-motions for summary judgment, in which the District renewed its

argument that the Court lacked subject-matter jurisdiction because Davis did not qualify as an

"original source." At the summary judgment stage, relying on United States ex rel. Findley v.

FPC-Boron Employees' Club, 105 F.3d 675 (D.C. Cir. 1997), this Court agreed, and dismissed

Davis's complaint for lack of subject-matter jurisdiction, holding that under Findley, he did not

qualify as an "original source." See United States ex rel. Davis v. District of Columbia, 773 F.

Supp. 2d 21 (D.D.C. 2011), overruled and vacated, 679 F.3d 832 (D.C. Cir. 2012). The Court

noted that the Supreme Court's decision in Rockwell International Corp. v. United States, 549

U.S. 457 (2007), raised some questions about the continuing vitality of the D.C. Circuit's

decision in Findley, but ultimately dismissed the complaint anyway, cautious not to "lightly infer

an abrogation of settled precedent." Id. at 33 (internal quotation marks omitted).

The D.C. Circuit affirmed in part and reversed in part. Regarding subject-matter jurisdiction, the D.C. Circuit held that "the policy judgment upon which [Findley] relied contradicts Rockwell's rationale," Davis, 679 F.3d at 838, so in light of the Supreme Court's decision in Rockwell, the D.C. Circuit held that Davis "is an original source and that the district court has jurisdiction over his claims." Id. at 839. On the issue of damages, the D.C. Circuit agreed that, even if the District had submitted claims without proper supporting documentation, "[t]he government got what it paid for and there are no damages." Id. at 840. The D.C. Circuit did note, however, that Davis "still may be eligible to share in the statutory penalties assessed against the District," should he prove that the District made one or more false claims. Id.

Back before this Court, the parties filed renewed cross-motions for summary judgment. The District included an argument that the D.C. Circuit chose not to rule on: that Davis's claims are barred by the FCA's six-year statute of limitations. On the issue of damages, Davis suggested that he was entitled to a civil penalty (in the amount of $5,500 to $11,000) for every interim claim incorporated within the Maximus Reports. See Pl.'s Mot. for Summ. J. ("Pl.'s MSJ") [ECF No. 102] at 13. The District contested Davis's damages theory, and also argued— for the first time in its reply brief—that the Maximus Transportation Report is not a part of Davis's claim. In response, Davis sought leave to file a (lodged) sur-reply, which the District opposed. The motions are now fully briefed and ripe for resolution.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex

8

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1); see also Celotex, 477 U.S. at 323.

In determining whether there is a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (citations omitted).  Summary judgment, then, is appropriate if the nonmovant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## DISCUSSION

Davis's claims expose very troubling behavior by the District, and are sufficient to establish liability under the False Claims Act.  But even though the District violated the law, the federal government suffered no damages.  This, combined with the fact that the statute of limitations bars a significant portion of Davis's claims, means that the District will get off relatively lightly in the end, owing a single civil penalty of $11,000.

## I.      THE MAXIMUS COST REPORT CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS.

The District argues that any claims arising out of the District's submission of the

Maximus Cost Report are barred by the FCA's six-year statute of limitations. See 31 U.S.C. § 3731(b)(1). The statute of limitations for a claim under the FCA begins to run on the date that the violation occurs. See id. ("A civil action under section 3730 may not be brought . . . more than 6 years after the date on which the violation of section 3729 is committed . . . ."). In a case like this one, in which the claim is alleged to be implicitly false at the moment of submission due to the lack of legally required supporting documentation, see, e.g., United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1376 (D.C. Cir. 2000), the violation occurred on the date that the allegedly false claim for payment was presented to the federal government. See, e.g., United States v. Rivera, 55 F.3d 703, 707 (1st Cir. 1995) (stating that an FCA violation "was committed, for statute of limitation purposes, whenever [defendant] can properly be said to have presented its [false] insurance claim to the government") (internal citation omitted).[2] Because Davis filed this lawsuit on April 4, 2006, see Compl., he may only seek damages for false claims presented to the federal government on or after April 4, 2000.

The parties' respective positions are simple. The District claims that the Maximus Cost Report was presented for payment to the MAA on January 12, 2000. Davis argues, on the other hand, that the record does not contain any admissible evidence to conclusively determine the date, so summary judgment on this issue is inappropriate. Davis is incorrect. His biggest problem is simple, and is best illustrated visually:

---

[2] Some language in cases from outside this Circuit suggests that the triggering date might, in some circumstances, be the date of payment, rather than the date of presentment. See, e.g., United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993) ("[T]he six-year limitations period of § 3731(b)(1) begins to run on the date the claim is made, or, if the claim is paid, on the date of payment.") (internal quotation marks omitted). Because the statute sets the triggering date as "the date on which the violation" occurs, 31 U.S.C. § 3731(b)(1), and the statute only requires the knowing presentment of a false claim—making no mention of payment—the statutory language seems to contemplate the date of presentment as the triggering date. In any event, Davis does not dispute the government's assertion that the limitations period begins on the date of presentment. And Davis implicitly accepts that premise by actively disputing the date on which the claim was presented (and discussing no other dates), so any contrary argument has been forfeited. Hence, because both parties seem to agree that the date of presentment is controlling, the Court need not explore this issue further.



Excerpt from Ex. E to Gov't's MSJ at 1. The "RECEIVED" stamp on the cover of the Maximus Cost Report is clear as day, and reveals the date on which the MAA "RECEIVED" the report as January 12, 2000. In response, Davis does not explicitly dispute that the document was presented to MAA on January 12, 2000, nor does he offer an alternate date. Instead, he argues (correctly) that it is the District's burden to prove this affirmative defense with admissible evidence, see Fed. R. Civ. P. 8(c)(1), and (incorrectly) that the date stamp is inadmissible hearsay.

To support summary judgment, evidence must generally be capable of being offered at trial in admissible form. See Fed. R. Civ. P. 56(c)(2). And the date stamp on the Maximus Cost Report does qualify as hearsay under the Federal Rules, as an out-of-court statement used to prove the truth of the matter asserted: that the document was received by MAA on January 12, 2000. But it is nevertheless admissible as a "business record" under Federal Rule of Evidence 803(6).[3] The District has offered a declaration from Adrienne Cooper, an administrative

---

[3] Rule 803(6) excepts from the general prohibition on hearsay evidence any "record of an act" that (A) "was made at or near the time [of the act] by . . . someone with knowledge" and was (B) "kept in the course of a regularly conducted activity of a business [or] organization;" as long as (C) "making the record was a regular practice of that activity," (D) "these conditions are shown by the testimony of the custodian or another qualified witness;" and (E) "neither the source of the information nor the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).

assistant who works at the District's Department of Health Care Finance (the successor agency to the MAA). See Cooper Decl. ¶ 2. Cooper declares under penalty of perjury that she is familiar with the relevant procedures, id. ¶ 3, that all documents that DHCF receives are stamped with the word "RECEIVED" and the date, id., and that the MAA used an identical procedure before it became DHCF, id. ¶ 4. This, combined with a review of the document itself, which presents nothing that would "indicate a lack of trustworthiness," is sufficient to qualify this document as a "business record," admissible under Federal Rule of Evidence 803(6).

Davis argues that the Maximus Report was not "kept in the ordinary course" of business, which would preclude its admission as a business record. See Fed. R. Evid. 803(6)(B). To support this argument, he points out that the version of the document relied upon by the District in the summary judgment record appears to be a copy, rather than the original, because it was produced during discovery by Bert Smith (the District's auditor), rather than by the District. See Pl.'s Opp'n & Reply [ECF No. 105] at 13 ("The pages of the Maximus Cost Report appended to Ms. Cooper's declaration bear a Bates stamp beginning with 'IA' for 'independent auditor."). To be sure, the business records exception to the hearsay rule requires that the document be "kept in the course of a regularly conducted activity." Fed. R. Evid. 803(6)(B). But Davis does not argue that the original version of the Maximus Report (or the original date stamp) does not meet this requirement—he argues only that the copy produced by Bert Smith, is, in fact, a copy, not the original.

But other evidentiary rules address these issues of admissibility of duplicates and originals, see Fed. R. Evid. 1001-08—the hearsay rules do not. Rule 1003 provides that "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed.

R. Evid. 1003. Davis does not argue that Bert Smith's copy of the date stamp is somehow inauthentic, or that someone tampered with the date stamp as it was electronically scanned during discovery. Accordingly, under Rule 1003, Bert Smith's duplicate of the Maximus Cost Report (and accompanying date stamp) is just as admissible under the "business record" exception as the original would have been.[4]

Finally, it seems that Davis himself has been a believer in the validity of the January 2000 date: his amended complaint alleges that "in January 2000, the DCPS Financial Officer . . . submitted to the [MAA] a FY98 Special Education Medicaid reimbursement cost claim . . . provided by Maximus." Am. Compl. ¶ 15. Davis has not sought leave to amend that allegation. Having alleged in his complaint that the Maximus Cost Report was submitted in January 2000, and in light of the clear evidence in the record,[5] Davis cannot avoid summary judgment on the statute-of-limitations issue now. Although this may be a factual dispute over a material fact, the dispute is not "genuine"—no reasonable jury, examining this record, could conclude that the Maximus Cost Report was submitted on or after April 4, 2000—the date six years prior to this action being filed.[6] Accordingly, any FCA claim based on the submission of this report is barred

---

[4] Davis explains that "[t]he District was never able to locate a copy of the Maximus cost report in its records," Pl.'s Opp'n & Reply [ECF No. 105] at 13, and the District does not dispute this assertion. Although it does not change the outcome here, it is remarkable that the District is apparently unable to find a single copy of this document in its records. The Maximus Cost Report was the basis of the District's request for tens of millions of dollars of federal funds. It is difficult to understand how such an important document could disappear. Nevertheless, because Bert Smith produced what appears to be a true and correct copy, and because no party has suggested that Bert Smith's copy is inauthentic, this organizational failure has no impact here.

[5] Davis cites some scattered deposition testimony, but none of it meaningfully contradicts the date stamp on the cover of the Maximus Cost Report. For example, Davis cites the deposition testimony of Steven Whitney, an employee of Maximus. See Pl.'s Opp'n & Reply at 12 (citing Ex. E to Pl.'s MSJ, Whitney Dep. at 24). But all Whitney said—ten years after the fact—is that he "believe[d]" that the Maximus Cost Report "was submitted around December 1999." Whitney Dep. at 24. Of course, January 12, 2000 is "around December 1999." And the context suggests he was referring to Maximus's submission of the report to DCPS, rather than DCPS's submission of the report to the MAA. See id. at 23-24. Even if Whitney (or others) had testified with greater confidence, ten-year-old memories are far less compelling than the actual "RECEIVED" stamp on the cover of the document, which is persuasive evidence of the date on which MAA received the report.

[6] The Court came to the same conclusion at an earlier stage of this litigation. See Davis, 773 F. Supp. 2d at 23 n.1 ("[T]here does not appear to be any genuine issue of material fact as to when the Maximus FY 98 Cost Report was submitted."). That determination may have been law of the case, but because the District did not make

13

by the statute of limitations, and the Court will grant partial summary judgment in favor of the District.

One important caveat: this statute-of-limitations holding applies only to the Maximus Cost Report—it does not apply to the Maximus Transportation Report. As the District ultimately concedes, "the record does not reflect when Maximus's transportation cost settlement report was submitted to MAA, other than it was submitted sometime after January 12, 2000, and before May 23, 2000." Def.'s MSJ at 19. Accordingly, summary judgment would be inappropriate on that issue, because the District bears the burden of proving this affirmative defense. See Fed. R. Civ. P. 8(c)(1).

## II.     THE DISTRICT KNOWINGLY SUBMITTED A FALSE CLAIM.

The False Claims Act imposes civil liability against a defendant who: (1) presented a claim to the federal government for payment, (2) which was false, and (3) which the defendant knew was false. See 31 U.S.C. § 3729(a)(1); United States ex rel. Harris v. Bernad, 275 F. Supp. 2d 1, 5-6 (D.D.C. 2003). FCA claims may satisfy the falsity element in one of two forms: (1) a factually false claim, in which a claimant submits information that is untrue on its face; or (2) a legally false claim, in which a claimant falsely represents that she has complied with a contractual term, statute, or regulation that is a prerequisite to payment. See, e.g., United States v. Honeywell Int'l Inc., 798 F. Supp. 2d 12, 19-20 (D.D.C. 2011). A legally false claim also comes in two forms: "express" or "implied." United States v. Science Applications Int'l Corp., 626 F.3d 1257, 1266 (D.C. Cir. 2010). The "implied" version is called an "implied false certification," in which the claimant makes no affirmatively false representation but fails to comply with a contractual, statutory, or regulatory provision where such compliance "was a

---

this argument, and because Davis did not raise the admissibility issues in his prior briefing, it is prudent to consider the issue anew.

prerequisite to the government action sought." <u>See, e.g.</u>, <u>id.</u>; <u>see also</u> <u>Siewick</u>, 214 F.3d at 1376. Davis's claim is based on the "implied false certification" theory, as he alleges that the District knowingly submitting the Maximus Transportation Report[7] to the federal government without possession of the requisite supporting documentation, even though the possession of such documentation was a prerequisite to payment under federal Medicaid regulations. Davis has adequately alleged—and supported with evidence in the summary judgment record—all elements of FCA liability.

**A.  The District "Presented" A Claim For Payment To The Federal Government.**

In previous stages of this litigation, the District argued that presentation of a reimbursement claim to the MAA—a District of Columbia government agency—could not lead to False Claims Act liability, because the claim for payment was not presented to the federal government.  <u>See</u> Def.'s Opp'n to Pl.'s Mot. to Amend [ECF No. 76] (arguing that Davis's proposed amended complaint would be futile, because "allegations that a false claim was submitted to a state Medicaid agency, like the District's Medicaid program, do not satisfy the False Claims Act's requirement that a false claim must be presented to the federal government").

In this round of summary judgment briefing, however, the District has seemingly abandoned this argument, and nowhere does it dispute Davis's argument that "[s]ubmission of the Maximus report[s] to MAA satisfies the False Claims Act requirement that claims be presented to the federal government."  Pl.'s MSJ at 8.  The District was wise to make this concession.  Setting aside the ever-vexing question of how exactly the District of Columbia government fits into our federal scheme—particularly with respect to a joint federal and "state"

---

[7] Davis also argues that the Maximus Cost Report represents a separate false claim.  But because that claim is barred by the statute of limitations, it will not be considered further.

program like Medicaid—the text of the False Claims Act conclusively refutes the District's previous position.  As the statute read at the relevant time, the statutory definition of a

> "claim" includes any request or demand . . . for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729 (2006).  Because the United States reimbursed the MAA for a "portion of the money" DCPS requested from MAA—actually, about 70% of it, Def.'s Stmt. ¶ 2—the claim for payment to MAA implicates the False Claims Act.  Courts in other jurisdictions have come to the same conclusion.  See, e.g., United States v. Shelburne, 2010 WL 2542054, at *2 (W.D. Va. June 24, 2010) ("[P]resenting a false claim to a 'state's Medicaid program is sufficient' for the FCA's presentment requirement because 'funds used to pay the claims are predominantly federal.'") (quoting United States ex rel. Putnam v. E. Idaho Reg'l Med. Ctr., 696 F. Supp. 2d 1190, 1200 (D. Idaho 2010) (noting near-unanimity of courts to have considered the question)); accord United States ex rel. Ven-A-Care v. Actavis Mid-Atlantic LLC, 659 F. Supp. 2d 262, 269 (D. Mass. 2009).

Under this legal framework, any reasonable jury would conclude that the District "presented" a false claim for payment to the federal government—through the MAA and its eventual reimbursement by CMS—within the meaning of the False Claims Act.

**B.  The District's Claim Was "False."**

Under the implied false certification theory of FCA liability, "a claim for payment is false when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term," where such "certification [is] a prerequisite to the government action sought."  Science Applications, 626 F.3d at 1266.  The District's submission of the

Maximus Transportation Report without possession of legally required supporting documentation satisfies this standard.

### 1. *Physical Possession of Audit-Quality Documentation*

The District's Medicaid plan allows for reimbursement of special-education costs only "in accordance with Medicare's Principles of Reasonable Cost Reimbursements described in 42 C.F.R. 413 Subparts A-G."  See District Medicaid Plan § 9(a)(1).  Those federal Medicaid regulations, in turn, require health care providers to maintain documentation that is "capable of verification by qualified auditors."  42 C.F.R. §§ 413.20, 413.24; see also Ex. B to Pl.'s MSJ, Deposition of Heather Bennett McCabe, PhD. [ECF No. 99-5] ("McCabe Dep.") at 22 (Q: "Is the provider required to maintain the forms that document the claims?" A: "Yes.").

So did the District, in fact, maintain such documentation?  The record is clear: it did not. See, e.g., Def.'s MSJ at 22; Ex C to Pl.'s MSJ, Deposition of Isaac Woode [ECF No. 99-6] ("Woode Dep.") at 34 (testifying that DCPS "didn't have the documentation"); Ex. D to Pl.'s MSJ, Declaration of Isaac Woode [ECF No. 99-7] ("Woode Decl.") ¶ 12 ("DCPS did not have the required service-specific documentation."); Ex. I to Pl.'s MSJ [ECF No. 99-12] ("CMS Review") at 2 (CMS review of DCPS cost settlements explaining that "DCPS have not been able to produce all the requested information").  In fact, the District does not dispute the key fact here: the District did not have physical possession of the relevant documentation at the time DCPS submitted the Maximus Reports for payment.  Instead, Davis & Associates had the documents, as Davis's firm had continued its work in preparing a fiscal year 1998 cost report that would never be submitted, due to the hiring of Maximus.  See Def.'s MSJ at 22 (criticizing Davis for retention of the documents, but implying that he has always had possession of them).[8]  This is a

---

[8] Although the record is not clear on this point, it sounds like Davis may still have the documents to this day.  The District called this extortion in its brief, but seems to be using the word in its colloquial sense, rather than

clear violation of both the District's Medicaid plan, <u>see</u> District Medicaid Plan § 9(a)(1), and federal Medicaid regulations, <u>see</u> 42 C.F.R. §§ 413.20, 413.24.

### 2. Constructive Possession Under An Implied Agency Theory

To solve this factual problem, the District tries a legal solution. It suggests that, because the District had previously hired Davis to help prepare the cost reports, and Davis had the supporting documentation in <u>his</u> possession, the District, therefore, constructively possessed the documents, under some sort of implied agency theory. <u>See</u> Def.'s MSJ at 22.

This theory has at least two flaws. First, no evidence in the record supports the District's assertion that the Maximus Reports were prepared or submitted in reliance on documents in Davis's possession. This implied agency theory—fully developed for the first time in the District's reply brief—appears to have been constructed solely for the purpose of defending the District's actions after the fact, divorced from the facts of what actually happened. Tellingly, the District's arguments in this regard are largely unaccompanied by citations to evidence in the summary judgment record. Conclusory assertions like these are insufficient.

Second, the District has not demonstrated the existence of an implied agency relationship between Davis and the District that would have justified the District's reliance on documents in Davis's possession—even if any facts suggested that the District did so rely. By the time DCPS submitted the Maximus Reports to MAA in January 2000, the District had already fired Davis, and hired Maximus to prepare its cost reports. <u>See, e.g.</u>, Ex. O to Pl.'s MSJ, Maximus Decision Proposal Letter [ECF No. 105-2] (signed agreement between Maximus and DCPS dated May 26, 1999); Ex. P to Pl.'s MSJ, June 3, 1999 Letter from DCPS CFO (describing DCPS's "new

---

its legal sense. <u>See</u> Def.'s MSJ at 22 ("Davis sought to extort funds from the District to obtain access to its own documents."). Because it is not relevant to resolving the parties' summary judgment motion—other than as an implicit admission that the District did not possess the relevant documents—the Court does not opine on the propriety of Davis's retention of these documents.

contract" with Maximus, which "represents a substantial reduction in fees" when compared with Davis & Associates) (emphasis omitted). The notion that the District "believed that [Davis] would provide the requisite data to support its Medicaid reimbursements, if necessary," Def.'s MSJ at 22, even though the District had replaced Davis with another contractor, is a stretch.

To be sure, if the District could point to some contractual arrangement (implicit or explicit) that required Davis to assist Maximus (its successor and competitor), in future preparation, submission, and validation of Medicaid cost settlement reports, that might change the analysis. But the District has presented no such evidence.[9] And as Davis points out, it is very difficult to demonstrate an implied agency relationship based on a past course-of-conduct (and hopes for gratuitous continuation of that conduct) under the common law of the District of Columbia. See, e.g., Davey v. King, 595 A.2d 999, 1001-03 (D.C. 1991) (reversing trial court's finding of an implied agency relationship based on putative principal's unjustified expectation of a continued course of gratuitous conduct); Tauber v. Jacobson, 293 A.2d 861, 867 (D.C. 1972) ("It is well established that mere expectancy of a continued course of conduct is not enough."). No such showing has been made here, and the District makes no effort to engage with this case law. Hence, when the District ended its contractual relationship with Davis and replaced his firm with Maximus, it forfeited the right to rely on documents in Davis's possession, absent some

---

[9] The closest the District comes—and the only evidence it offers in support of this theory—is an unsigned letter (perhaps a draft?) from Davis's counsel in May 2006. See Ex. M to Def.'s MSJ [ECF No. 107-2]. Ignoring for the sake of argument that this letter appeared for the first time as an attachment to the District's reply brief, it is too thin a reed to support the District's implied agency argument. True, the letter makes a reference to Davis's "contractual obligations," and suggests that Davis "has maintained the documents for audit purposes" since 1998. Id. But what "contractual obligations" are being referenced here? Was this letter ever sent to anyone? What to make of the statement in the letter that "Davis & Associates is no longer under contract to the District of Columbia"? In short, the letter is not strongly supportive of either party's position. In any event, another judge in this district has already ruled (in litigation arising out of the District's failure to compensate Davis for his work) that any contract between Davis and the District was void ab initio, due to failure to comply with the Anti-Deficiency Act. See Davis & Assocs., Inc. v. District of Columbia, 510 F. Supp. 2d 77, 81 (D.D.C. 2007).

indication that the parties had agreed on such an arrangement.  There being no such indication here, the District's implied agency argument fails.

### 3. Materiality

To satisfy the "falsity" element "under an implied certification theory, the plaintiff must prove by a preponderance of the evidence that compliance with the legal requirement in question is material to the government's decision to pay."  Science Applications, 626 F.3d at 1271.  Davis carries this burden.  He points to persuasive evidence in the summary judgment record that supports the (intuitive) notion that the federal government would refuse to reimburse for medical services if it knew that those services were not supported by the requisite documentation, specifically called for in both the federal Medicaid regulations, see, e.g., 42 C.F.R. §§ 413.20, 413.24(a), 413.24(c), and the District's Medicaid Plan, see District Medicaid Plan § 9(a)(1).  See also, e.g., McCabe Dep. at 19-22 (testifying that only "clean claims" are reimbursed by the federal government, which requires maintenance of "the forms that document the claims," and also testifying that claims are not reimbursable, for example, if "the person isn't licensed, if the Medicaid eligibility has lapsed, if the service is not in the State Plan, if it's not an allowable health care service under Medicaid," or if the claim is "not documented appropriately"); see also CMS Review, at 2 ("DCPS is required to submit financial information which would allow MAA to determine what DCPS's actual costs were for providing the services that were already billed and paid on an interim basis.").  This is not surprising—the regulatory mandate to maintain audit-quality documentation that allows "proper determination of costs payable," 42 C.F.R. § 413.20(a), would be toothless if the government would reimburse for unsupported claims.

The District offers one sentence of argument in response: "Davis cannot show that any provision violated by the District is material for payment of its claims."  Def.'s Mot. at 24.  This

sentence is accompanied by no citations. Even assuming that one conclusory sentence is sufficient to preserve the District's materiality argument, but see Schneider v. Kissinger, 412 F.3d 190, 200 n. 1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."), it is unpersuasive, and insufficient to create a genuine dispute of material fact. The requirement to maintain audit-quality supporting documentation for Medicaid reimbursement requests is far from a "merely ancillary" contractual or regulatory requirement that can be excused as immaterial. See Science Applications, 626 F.3d at 1271 ("Payment requests by a contractor who has violated minor contractual provisions that are merely ancillary to the parties' bargain are neither false nor fraudulent."). The District's non-compliance with the documentation requirement was material, and, for all the reasons set forth above, the Maximus Transportation Report was implicitly "false."

### 4. Other Arguments Against The Implied False Certification Theory

The District includes a "catch-all" section in their briefing, under the heading "The Theory of Implied False Certification Does Not Apply." Def.'s MSJ at 22. But these arguments, too, are unpersuasive. For example, in an argument that is flatly inconsistent with its other submissions, the District at times suggests that it did, in fact, have possession of all requisite documentation. In a conclusory footnote, the District claims:

> The assertion that the District lacked any supporting documentation is clearly disputed by the District's deposition testimony and documents, which show that DCPS did have supporting documentation in its possession at the time it submitted the FY 1998 cost reports and in 2003. As the District has shown, all supporting documentation for the transportation cost report is in its possession.

Def.'s MSJ at 23 n.14; see also id. at 24 ("As the District has always contended, it had the supporting documentation in its possession at the time the Medicaid claims were filed with

MAA."). If true, of course, these statements would drastically alter this case. But they are not true. They are supported by no citations, and no evidence. And the Court is at a loss to understand on what the District could be basing these assertions. Perhaps the most charitable explanation is that the District is using the word "possession" here loosely, as a cross-reference to their theories of constructive possession and implied agency. To the extent that is what the District is attempting to argue, the argument fails for reasons already explained. To the extent the District is arguing it had <u>physical</u> possession, that argument is inconsistent with its other submissions, is supported by no evidence whatsoever, and is contradicted by ample evidence in the record.

Finally, the District tries to draw a distinction between the documentation required to support a claim for reimbursement for medical services and for transportation services, asserting (again, without citation) that less documentation is required for reimbursement for transportation services. But nothing in the record supports this theory. On the other hand, Davis's response—that claims for reimbursement for transportation services require the same documentation that is used to support claims for reimbursement for medical services—does find support in the record. <u>See</u> Ex. F to Pl.'s MSJ, Deposition of Dorothy Page Proctor [ECF No. 99-9] ("Proctor Dep.") at 35 (testifying that reimbursement for transportation services is paid only if the District verifies "that a service was performed and the student was on the bus that day," and that if verification is lacking "we throw out that claim"). Once again, Davis's version of events is the only one supported by the summary judgment record.

**C. The District Submitted The False Claim "Knowingly."**

The FCA defines the requisite mental state of a "knowing" violation as a violation by someone with "actual knowledge," "deliberate ignorance," or "reckless disregard" of the truth or

falsity of the claim. 31 U.S.C. § 3729(b)(1). The plaintiff is not required to prove a "specific intent to defraud." Id.

Davis argues that the District submitted the false claim "knowingly," as evidenced by his repeated conversations with high-ranking employees of the District, warning them that the Maximus Reports could not have been properly documented, because only Davis had the documentation. The record supports Davis's contentions. See Ex. J to Pl.'s MSJ, Statement of Michael L. Davis [ECF No. 99-13] ("Davis Stmt.") at 2 ("[Davis & Associates] contacted the DCPS CFO to inform him that Maximus had not been the DCPS Medicaid contractor for FY98, and therefore had no documentation to support such a claim."); see also id. (explaining that Davis, at a meeting with Deputy Mayor of the District of Columbia Erik S. Gaull, and DCPS CFO Don Rickford, explained that the Maximus Reports were "erroneous and unsubstantiated, inasmuch as neither Maximus nor DCPS had any documentation to support" the reimbursement claims). Despite these warnings to high-level managers at both DCPS and the District, DCPS submitted the claims to the federal government for reimbursement, "knowing that neither they nor Maximus could support or document any claim." Id. In light of these facts, the District, at the very least, exhibited "reckless disregard" for whether it was in compliance with Medicaid regulations requiring reimbursement claims to be adequately supported.

The District's response is a narrow one. It does not dispute that high-level managers at DCPS and the District received stern warnings from Davis about the lack of documentation. Instead, the District argues that, even if it knew that it did not have the supporting documentation, any false claim was still not made "knowingly," because the District felt it could rely on the fact that Davis, its former contractor, possessed the documents. See Def.'s MSJ at 22 ("The District's reliance on Davis's assurances that D & A would provide the supporting

documentation was at most, an innocent mistake or negligence, but not a knowing presentment of a false claim.").

Of course, this is simply another bite at the apple for the implied agency argument the Court has rejected in considering the "falsity" element. In truth, it is mostly non-responsive to the question of whether the false claim was made "knowingly." And for the reasons explained above, any reliance on the contractor it had already fired—even if it were, counterfactually, supported by evidence in the record—would have been unjustified.

But again, on the relevant question—that is, what the District knew and when—the District offers nothing. No argument, no record evidence—nothing. So in light of Davis's well-supported arguments on the "knowingly" element, and the District's failure to meaningfully respond, summary judgment in favor of Davis is appropriate.

\*   \*   \*

For the reasons set forth above, Davis has offered evidentiary support for all elements of the "implied false certification" theory of False Claims Act liability. The District's responses, on the other hand, generally find little or no support in the summary judgment record. Hence, there is no genuine dispute of material fact regarding the District's "knowing" "presentment" of a "false" claim for payment to the federal government, and the Court will grant summary judgment in favor of Davis with respect to his FCA claim arising out of the Maximus Transportation Report.[10]

_____

[10] For the first time in its reply brief, the District argued that the Maximus Transportation Report is not a part of Davis's claim. See Def.'s Reply [ECF No. 107] at 3 ("The District respectfully submits that its motion for summary judgment be granted as to the transportation cost report because it is not part of Davis's FCA claim . . . ."). Because this was a new argument, Davis sought leave to file a sur-reply to address it. See Pl.'s Mot. for Leave to File Lodged Sur-Reply [ECF No. 108]. The Court will grant Davis leave to file the sur-reply, because the District had never raised this issue before. See United States v. Baroid Corp., 346 F. Supp. 2d 138, 143 (D.D.C. 2004) (leave to file may be granted when a sur-reply is necessary "to address new matters raised in a reply, to which a party would otherwise be unable to respond"). Davis is also correct on the merits: he has always challenged the entirety of the Fiscal Year 1998 cost submission, and has never limited his claim to the Maximus Cost Report. See

### III.     THE FEDERAL GOVERNMENT SUFFERED NO DAMAGES.

All of Davis's claims are predicated on the lack of proper documentation to support reimbursement claims—he "does not allege that any services paid for were not provided." <u>Davis</u>, 679 F.3d at 840; <u>see also id.</u> ("The sole defect Davis claims is the failure to maintain documentation for those services.").    Nevertheless, in previous stages of this drawn-out litigation, Davis argued that "the United States Treasury has suffered millions of dollars in damages," Am. Compl. ¶ 24, because the federal government would not have paid any reimbursement if it knew that the District did not maintain proper documentation.  Indeed, even in this round of summary judgment briefing, Davis tries a softer version of this argument, suggesting in an ambiguous footnote that the government "suffered damages" notwithstanding "the eventual reimbursement of $7,601,381" and the fact that all of the billed services actually were provided.  <u>See</u> Pl.'s Mot. at 11 n.6.

But the D.C. Circuit was clear: "the government suffered no damages."  <u>Davis</u>, 679 F.3d at 839.   "Because all agree that the services paid for were provided, the maintenance of documents to prove that they were has no independent monetary value."  <u>Id.</u> at 840.  Judge Griffith, writing for a unanimous panel, put it eloquently: "A server's failure to bring a receipt after dinner causes no harm when you know you've been properly charged.  The same is true here: The Government got what it paid for and there are no damages."  <u>Id.</u>  That D.C. Circuit holding is correct—and perhaps more importantly for current purposes, it is binding.  Hence, Davis is not entitled to recover any compensatory damages; the federal government suffered

---

<u>generally</u> Am. Compl. (repeatedly using the plural "claims" rather than "claim," and drawing no distinction between medical services and transportation services).

none.  Of course, this also means that Davis is not entitled to "treble" damages, Am. Compl. ¶ 29—three times zero is zero.[11]

## IV.    THE DISTRICT OWES ONE CIVIL PENALTY.

Although Davis is not entitled to compensatory damages, the D.C. Circuit correctly noted that Davis "still may be eligible to share in the statutory penalties assessed against the District." Davis, 679 F.3d at 840.  Because the District submitted an impliedly false claim when it presented the Maximus Transportation Report for payment without possession of the federally required supporting documentation, the District is liable for civil penalties.

The next question: how many false "claims" did the District submit?  Davis seeks a $5,500 to $11,000 civil penalty for every interim claim paid to DCPS during the relevant time period—all 399,960 of them, for a grand total of anywhere between $2,199,780,000 and $4,399,560,000 in civil penalties.  Unsurprisingly—considering the high-end estimate of $4.4 billion in damages is more than double the yearly budget of DCPS[12]—the District takes issue with those calculations, and argues that, "at most, the District should be liable for a single civil penalty."  Def.'s MSJ at 24.

The Court agrees with the District.  These "interim" claims are not final, and are not based on the actual cost of the services provided.  See Def.'s Stmt. ¶¶ 9-10.  Moreover, they are not presented to the federal government piecemeal; rather, they are aggregated and submitted for reimbursement collectively at the end of the year, in final form.  The Supreme Court and the Second Circuit have suggested that "the number of assertable FCA claims is not measured by the

---

[11] In his amended complaint, Davis also alleged that the District made an internal accounting error, allocating Medicaid FFP funds to the District's general treasury account instead of where it belonged, in the DCPS Special Education Reimbursement Account.  See Am. Compl. ¶ 21.  He suggested that this, too, caused the federal government to suffer damages.  See id. ¶ 24.  Davis never explained how an internal accounting decision by the District could have damaged the federal government.  In any event, Davis has seemingly abandoned this facet of his claim now, making no reference to it in any of his summary judgment briefs.  Accordingly, the Court will not consider this damages theory.

[12] See District of Columbia FY 2013 Budget Request Act, available at http://cfo.dc.gov/node/290052.

number of contracts, but rather by the number of fraudulent acts committed by the defendant." Kreindler, 985 F.2d at 1157 (citing United States v. Bornstein, 423 U.S. 303, 311 (1976)).  Here, DCPS committed a fraudulent act when it presented year-end cost settlement reports for payment, despite the lack of supporting documentation, but not every single time an interim claim was paid during each fiscal year.  That means that the Maximus Transportation Report represents one false claim, for which the District is liable for one civil penalty (the Maximus Cost Report would have been a second false claim, but for the statute-of-limitations problem). To return to Judge Griffith's restaurant hypothetical, a dastardly diner who tried to pay for a fancy dinner with a forged check would not be liable for three counts of fraud just because he ordered a soup, a salad, and dessert—he committed fraud once when he tried to pay the total bill with a bad check.  The same is true here.  Just because the Maximus Transportation Report was generated by means of a series of smaller, individual services, that does not mean that every one of those services represents a separate "claim" under the FCA.  Instead, the District presented one false "claim" when it submitted the Maximus Transportation Report for payment.

Although this outcome seems clear enough, it is worth noting that under Davis's theory, the District would be liable for billions of dollars in civil penalties, even though the federal government suffered no financial harm.  When faced with two potential interpretations of the statutory phrase "a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(A), one of which leads to an absurd conclusion, the Court is on firmer ground interpreting the statute to avoid that absurdity.  See, e.g., United States v. Am. Trucking Ass'n, 310 U.S. 534, 543 (1940) ("When [one possible statutory] meaning has led to absurd or futile results . . . this Court has looked beyond the words to the purpose of the act."); Ctr. for Biological Diversity v. EPA, 722 F.3d 401, 411 (D.C. Cir. 2013) (describing "the absurd results doctrine" as "the long-standing rule that

a statute should not be construed to produce an absurd result") (internal quotation marks omitted).  The notion that Congress would have wanted the District to shell out billions of dollars in civil penalties in a case with no actual damages is hard to take seriously.

Hence, the District is liable for one civil penalty, within the range of $5,500 to $11,000.  See 28 C.F.R. § 85.3(a)(9).[13]  Here, the maximum civil penalty of $11,000 is appropriate.[14]  The District is lucky it did not have to pay more, given the cavalier attitude it adopted in submitting millions of dollars in reimbursement claims without the legally required supporting documentation, and the fact that all claims arising out of the Maximus Cost Report were barred by the statute of limitations.  It is also appropriate that Davis receive 30% of that recovery,[15] which will partially reward him for the eight years of litigation that was necessary to fully expose the District's carelessness to the public.

## CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part the parties' cross-motions for summary judgment.  A separate order accompanies this Memorandum Opinion.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: March 31, 2014

---

[13] The False Claims Act itself calls for a civil penalty between $5,000 and $10,000.  See 31 U.S.C. § 3729(a)(1).  Those minimums and maximums were increased, however, by the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990 and accompanying regulations.  See 28 C.F.R. § 85.3(a)(9) ("False Claims Act, violations: minimum from $5,000 to $5,500; maximum from $10,000 to $11,000.").

[14] The parties did not brief this issue.  Perhaps they figured it was not worth their time, given that meaningful case law explaining how a district court should exercise its discretion in imposing a civil penalty within the statutory range is practically non-existent.  See, e.g., United States ex rel. Virgin Islands Hous. Auth. v. Coastal Gen. Const. Servs. Corp., 299 F. Supp. 2d 483, 489 (D.V.I. 2004) (citing legislative history suggesting that district courts have discretion to impose civil penalties within the statutory range, but noting there is "no real guidance from the common law or legislative history" as to how a district court should exercise that discretion).

[15] Because the United States did not intervene, see Oct. 24, 2007 Notice of Election to Decline Intervention [ECF No. 16], Davis is entitled to between 25% and 30% of the recovery.  See 31 U.S.C. 3730(d)(2) (granting discretion to the district court to make this determination).  For the same reasons that the District is liable for the full $11,000 civil penalty, Davis is entitled to the full 30% recovery.